# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## AT LEXINGTON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL NO. 5:19-96-KKC** |
|     **Plaintiff,** | |
| | |
| **V.** | **MEMORANDUM** |
| | **OPINION AND ORDER** |
| | |
| **TEVYE T. JONES,** | |
|     **Defendant.** | |

**\*\*\* \*\*\* \*\*\***

This matter is before the Court on Defendant Tevye Jones' motion to suppress (DE 24), which seeks to suppress all evidence seized from a pat-down search of Jones. For the reasons stated below, the Defendant's motion to suppress is **DENIED**.

## I. BACKGROUND

Defendant is charged with possession of a firearm by a convicted felon and possession of cocaine. The investigation culminating in the arrest of the Defendant began while officers were attempting to locate a juvenile, referred to in this opinion as K.B. K.B. was a validated member[1] of a local gang (the "530 gang") and was wanted in connection with an investigation.

Officers had received and investigated information about the 530 gang in the past. The 530 gang is known to feud with other local gangs and has a history of drug activity and violence. Members of the 530 gang have been involved in various drive-by shootings and are known to carry firearms. Additionally, at the time of Defendant's arrest, officers had

---

[1] Officers testified at the evidentiary hearing that they use a points system that rates various evidence of gang membership. They use this system to validate gang members and their associates.

information that the 530 gang were in possession of a large number of firearms, including glocks, rifles, AR pistols, and AK 47s. Officers had viewed a recent photograph on social media showing 530 gang members posing with firearms and money at a residence on Dalton Court in Lexington, Kentucky (the "Dalton Court Residence").

A gang intel unit, in attempting to locate K.B., was conducting surveillance of the Dalton Court Residence. While conducting surveillance, officers observed Keyonta Thomas and another unidentified black male, later identified as the Defendant, enter a car that stopped at the Dalton Court Residence. Officers were familiar with Thomas—who was also a validated 530 gang member—from their past investigations of the 530 gang. Officers had viewed Thomas, K.B., and another gang member posing with firearms and money in a recent photograph taken outside of the Dalton Court Residence.

The intel unit decided to follow the vehicle. Detective Jody Kizis testified that at the time the officers decided to follow the vehicle, they did not know whether the unidentified male was K.B. The intel unit followed the vehicle to a residence on Gerald Drive (the "Gerald Drive Residence") and communicated information to Detective Kizis by radio. The police were also familiar with the Gerald Drive Residence because it was a known narcotics trafficking site based on innumerable prior drug investigations. Thomas and the Defendant—still unidentified—exited the vehicle, entered the residence for a very brief period of time, and returned to the vehicle. The vehicle then left the Gerald Drive Residence, and observing officers reported that it made an illegal u-turn. Officers further stated that the vehicle was travelling at a high rate of speed.

Detective Kizis and another patrol unit summoned to assist performed a traffic stop on the vehicle. There were four occupants of the vehicle, Nephaju Jones, Keyvion Berrios, Thomas, and the Defendant. Detective Kizis testified that when he approached, he confirmed that K.B. was not present. He further stated that all occupants appeared to be nervous

during the stop. Officers intended on introducing a canine to the vehicle due to its brief stop at the Gerald Drive Residence. However, for safety reasons, officers first decided to perform a pat-down frisk of the occupants of the vehicle. Officers testified that a "signal 10" had been issued regarding the Dalton Court Residence, meaning that people at that residence were suspected to be armed and dangerous. Officers were aware of the violent tendencies of the 530 gang, and Thomas—a validated gang member known to carry firearms—was present in the vehicle.

The officers ordered each of the occupants out of the vehicle for a pat-down frisk. Officer Rachel Kennedy frisked the Defendant and immediately located a firearm with a fully loaded extended magazine and a round in the chamber. When Officer Kennedy removed the firearm from the Defendant's person, a bag of cocaine fell out of his pocket. Officers later validated the Defendant as a member of the 530 gang.

Defendant filed a motion to suppress, seeking to suppress the evidence found in the pat-down search. (DE 24.) Defendant asserts the following: (1) there was no probable cause to believe a traffic violation had occurred; (2) there was no reasonable suspicion for an investigatory stop; and (3) there was no reasonable suspicion warranting a pat-down search.

The Court held an evidentiary hearing on November 6, 2019 where Detective Kizis and Officer Kennedy testified to the facts stated above. The Court also heard testimony from Nephaju Jones and Keyvion Berrios, the driver and front passenger of the vehicle that was stopped. The Court considered the evidence presented and denied the motion to suppress from the bench. The Court stated that it would issue a full memorandum opinion more fully addressing the reasons for denial cited on the record.

As further explained below, the Court finds that there was reasonable suspicion for the investigatory stop of the vehicle and that there was reasonable suspicion that the Defendant was armed and dangerous, warranting a pat-down search. As such, the motion to suppress

is denied.  The Court declines to determine whether there was probable cause to believe a traffic violation had occurred because it finds that the stop was permissible based on the reasonable suspicion for the investigatory stop.

## II. ANALYSIS

### A.  Reasonable Suspicion for the Investigatory Stop.

The Court finds that, based on the totality of the circumstances, officers had reasonable and articulable suspicion that occupants of the vehicle were involved in criminal activity. Officers may detain a suspect under suspicious circumstances if they possess a reasonable and articulable suspicion that the individual has been involved in criminal activity. *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994).  "While an 'individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime,' police 'officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.'" *United States v. Pearce*, 531 F.3d 374, 383 (6th Cir. 2008) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

In the present case, considering the totality of the circumstances, officers possessed reasonable and articulable suspicion that occupants of the vehicle had been involved in criminal activity.  The following circumstances warranted an investigatory stop.  A gang intel unit was conducting surveillance on the Dalton Court Residence attempting to locate K.B. for an outstanding investigation when they observed a vehicle pull up to the residence. Officers were familiar with the Dalton Court Residence because it was a known 530 gang hang out based on complaints about the residence and a recent photograph of gang members posing outside the residence holding firearms and money.  The 530 gang members are known

4

to carry firearms and they have a history of drug activity and violence. The officers observed two individuals exit the Dalton Court Residence and enter the vehicle. They identified one of the individuals as Thomas, a validated member of the 530 gang. Officers had viewed a recent photograph of Thomas, K.B. and another gang member posing outside the Dalton Court Residence possessing firearms and money. Detective Kizis testified that the observing officers could not tell whether the other individual traveling with Thomas was K.B. Police followed the vehicle to the Gerald Drive Residence, which was a residence known for significant drug activity based on numerous past investigations. The officers observed the two individuals exit the vehicle, enter the residence, and return approximately one minute later. Detective Kizis testified that such stop is consistent with a narcotics purchase. The intel unit observing then reported an illegal u-turn and subsequent high rate of speed. Then, the intel unit instructed Detective Kizis to perform a traffic stop on the vehicle. At that point, there was reasonable suspicion to stop the vehicle for an investigatory stop based on the suspicion that the occupants of the vehicle had been involved in criminal activity. Considering (1) the information known to officers regarding the 530 gang, their violence, and their drug activity; (2) the officers' observation of the Defendant and Thomas leaving the known gang hang out; (3) the officers' knowledge that Thomas and K.B. were validated 530 gang members; (4) the officers' observation of a recent photograph of K.B. and Thomas posing with another gang member outside the Dalton Court Residence holding firearms and money; (5) the observed short stop at the Gerald Drive Residence, a residence known for narcotics trafficking and located in a high crime area; (6) the fact that officers were unable to confirm whether the Defendant was K.B.; and (7) the reported illegal u-turn and subsequent travel from the Gerald Drive Residence at a high rate of speed, the Court finds that officers had reasonable and articulable suspicion to believe that Thomas and the Defendant were involved in criminal activity.

**B. Reasonable Suspicion for the Pat-down Search.**

The Court further finds that there was reasonable suspicion, based on the totality of the circumstances, to believe that the Defendant was armed and dangerous, warranting a pat-down search. A pat down of the outer clothing is permissible where an officer has reasonable suspicion that the person to be searched is armed and dangerous. *United States v. Noble*, 762 F.3d 509, 521 (6th Cir. 2014) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). In determining whether there was reasonable suspicion warranting a pat-down search, the Court must consider the totality of the circumstances. *Id.* Reasonable suspicion exists if a reasonably prudent person under the circumstances would be warranted in believing that his or her safety or that of others was in danger. *Id.* at 521-22. There must be a particularized and objective basis for suspecting that the particular individual is armed and dangerous. *Id.* at 522. "Officers are entitled 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

In the present case, considering the totality of the circumstances, officers possessed reasonable and articulable suspicion that the Defendant was armed and dangerous, warranting a pat-down search. The Court finds that a reasonably prudent person under the circumstances of this case would be warranted in believing that his or her safety or that of others was in danger. The following circumstances, considered in the aggregate, warranted the officers' pat-down search of the Defendant. First, officers observed the Defendant exiting a known 530 gang hang out accompanied by Thomas. Second, officers were familiar with the 530 gang, knew that 530 gang members often carried firearms, and were aware of their history of drug trafficking and violence. Third, officers had validated Thomas as a 530 gang member and had viewed a recent photograph of him outside of the Dalton Court Residence

posing with other gang members possessing firearms and money. Fourth, Thomas and the Defendant rode in a vehicle together to the Gerald Drive Residence—a residence known for narcotics trafficking—and made a very brief stop in that residence. Officers testified that the brief nature of the stop was consistent with a drug purchase and that narcotics traffickers often carry firearms for protection. And finally, a "signal 10" had been issued for the Dalton Court Residence, meaning that any individuals at that residence were suspected to be armed and dangerous. The "signal 10" was relayed to the officers who initiated the traffic stop. A reasonably prudent person would be warranted in believing that an individual is armed and dangerous where that individual has (1) exited a gang hang out of a gang known for drug trafficking, violence, and firearm possession; (2) exited a residence at which several gang members were recently photographed possessing firearms and money; (3) exited a residence that had been labeled a "signal 10" based on belief that the individuals at that residence were armed and dangerous; (4) traveled in close proximity with a validated 530 gang member who had been recently photographed with firearms and money outside the gang hang out; and (5) entered a known narcotics trafficking site with a gang member of a gang known for drug trafficking, violence, and firearm possession. Considering the foregoing facts in the aggregate, the Court finds that officers possessed reasonable and articulable suspicion that the Defendant was armed and dangerous, warranting a pat-down search.

The Defendant relies heavily on *Noble* in asserting that there was no reasonable suspicion to believe that he was armed and dangerous. In *Noble*, police were attempting to intercept members of a methamphetamine-trafficking operation based on a tip received from a cooperating defendant. *Noble*, 762 F.3d at 513. The informant told officers that one of the conspirators would be traveling from Lexington to Louisville to purchase methamphetamine. *Id.* at 514. He told officers that the conspirators would be traveling in a white Jeep Cherokee and provided a license plate number. *Id.* When police were unable to locate the Jeep

Cherokee, the informant told them that the conspirators might instead be using a dark-colored Chevrolet Tahoe and that they may have stopped at a motel near an exit off the highway. *Id.* The informant stated that the conspirators had used that location as a meeting point in the past. *Id.* Upon arrival at the motel, officers located both of the automobiles described in the parking lot. *Id.* Officers observed the Tahoe leaving the parking lot and initiated a traffic stop on the vehicle after they observed it crossing a center line. *Id.* at 515. Officers stated that Noble appeared extremely nervous throughout the duration of the traffic stop, and he was shaking a lot. *Id.* Considering the vehicle's connection to drug trafficking, Noble's extreme nervousness, and the officers training and experience that individuals involved in narcotics trafficking often carry weapons, the officer conducted a pat-down of Noble that revealed narcotics, drug paraphernalia, and a loaded pistol. *Id.* at 516. Noble moved to suppress the evidence, asserting that there was no reasonable suspicion that he was armed and dangerous. *Id.* at 517. The District Court denied the motion to suppress, and the Sixth Circuit reversed. *Id.* at 513-14. The Sixth Circuit explained that although it was a close call, there was no reasonable suspicion that Noble was armed and dangerous. *Id.* at 522. The Sixth Circuit discounted Noble's extreme nervousness, stating that, alone, nervousness is generally an unreliable indicator of someone's dangerousness. *Id.* The Sixth Circuit further noted that a person's "mere presence in a car, which the police believe is connected to drug trafficking, is not an automatic green light for frisking that person." *Id.* at 523 (citing *United States v. Bell*, 762 F.2d 495, 499 (6th Cir.1985)). The Court concluded: "[w]ithout some sort of action on the part of Noble, besides his mere presence in a vehicle suspected of being involved in the drug trade, we cannot hold that [the officer] had a reasonable belief that he was in danger, which would permit him to conduct a frisk of Noble." *Id.* at 524.

*Noble* is distinguishable from the present case because the present case involves significant connections to the 530 gang—a gang that has a history of violence, drug trafficking, and firearm possession. Although Defendant at the time of his arrest was not a validated member of the 530 gang, he appeared to be associated with the gang. Officers observed the Defendant exiting the Dalton Court Residence, a known gang hang out where gang members had recently posed for a photograph holding various firearms and money. Officers additionally observed the Defendant associating and traveling with Thomas, a validated 530 gang member who was in the aforementioned photograph posing with firearms and money. Finally, officers, based on past investigations of the 530 gang, knew that gang members and their associates usually carried firearms. This case is further distinguishable from *Noble* because here, a "signal 10" had been issued regarding individuals present at the Dalton Court Residence. These facts, in combination with the others discussed above rose to the level of reasonable suspicion necessary to a conduct pat-down search of the Defendant.

### III. CONCLUSION

Considering the totality of the circumstances, officers had reasonable suspicion warranting an investigatory stop and pat-down of the Defendant. Accordingly, the Court **HEREBY ORDERS** that the Defendant's motion to suppress (DE 24) is **DENIED**.

Dated November 26, 2019.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY